Filed 7/17/26  P. v. Jenkins CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE

# Court of Appeal of the State of California

IN AND FOR THE

# Fifth Appellate District

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>JAMES DEAN JENKINS,<br><br>    Defendant and Respondent. | F089163<br><br>(Super. Ct. No. 13CM2857HTA)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the opinion filed herein on July 6, 2026, be modified in the following particulars:

1. On page 18, change the first heading designation from "**II**" to "**III**".

2. On page 21, insert the following two new paragraphs just before the "**CONCLUSION**":

> Jenkins argues that California Rules of Court,[1] rule 4.424 and *People v. Salazar* (1987) 194 Cal.App.3d 634 (*Salazar*) together allow a sentencing court to make findings contrary to a jury's verdict when determining which term to stay under section 654.  He asserts that section 654's purpose

---

[1] Further references to rules are to the California Rules of Court.

of ensuring punishment commensurate with culpability "is undermined if the sentencing court is prohibited from considering the very evidence that bears on which offense best captures the defendant's conduct." To be sure, the court may "consider" the evidence of the offenses in exercising its section 654 discretion. But the cited authorities do not authorize the court to make findings that contradict the jury's verdict when exercising that discretion.

Rule 4.424 states that, when section 654 applies, the sentencing court has discretion to choose which term to stay and which to execute.[2] *Salazar* involved an exercise of section 654 discretion, and the statute read substantially then as it does now, providing courts with discretion to choose which term to stay and which to execute. (*Salazar, supra,* 194 Cal.App.3d at p. 639.) *Salazar* held that this discretion allowed a court to select the offense "most appropriate for the defendant's conduct" rather than automatically imposing the greater term. (*Ibid.*) Jenkins cites this part of the holding to support his position. But *Salazar* involved a guilty plea, not a jury verdict. (*Id.* at p. 636.) Thus, the trial court's characterization at sentencing of [Salazar's] conduct as "primarily an assault" (he pleaded to (1) assault with force likely to produce great bodily injury and (2) robbery) was the only factual determination on that question, not one that contradicted a jury finding. (*Id.* at p. 639.) *Salazar* accordingly provides no support for exercising rule 4.424 discretion by making a finding that contradicts a jury verdict.

---

[2] Rule 4.424 reads: "Before determining whether to impose either concurrent or consecutive sentences on all counts on which the defendant was convicted, the court must determine whether the proscription in section 654 against multiple punishments for the same act or omission requires a stay of execution of the sentence imposed on some of the counts. If a stay of execution is required due to the prohibition against multiple punishments for the same act, the court has discretion to choose which act or omission will be punished and which will be stayed."

There is no change in the judgment.  Respondent's petition for rehearing is denied.

SNAUFFER, J.

WE CONCUR:

LEVY, Acting P. J.

DE SANTOS, J.

Filed 7/6/26  P. v. Jenkins CA5 (unmodified opinion)

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Appellant,<br><br>          v.<br><br>JAMES DEAN JENKINS,<br><br>     Defendant and Respondent. | F089163<br><br>(Super. Ct. No. 13CM2857HTA)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Valerie R. Chrissakis, Judge.

Sarah Hacker, Kings County District Attorney, Katherine Smith, Deputy District Attorney Supervisor, and Crystal Howard, Contracted Prosecuting Attorney, for Plaintiff and Appellant.

Laura P. Gordon, under appointment by the Court of Appeal, for Defendant and Respondent.

-ooOoo-

Defendant James Dean Jenkins was resentenced under Penal Code[3] section 1172.75, and the People appeal from the imposition of the new sentence.  At

---

[3] Undesignated statutory references are to the Penal Code.

resentencing, the trial court stayed under section 654 an indeterminate life term for willful, deliberate, and premediated murder of a peace officer in favor of a 16-month determinate term for assault with a deadly weapon.

The People raise five issues on appeal, only two of which we need address. We first reject the People's claim that section 664, subdivision (f), prohibited the trial court from staying the indeterminate life term for the attempted murder count. However, we agree with the People that the court abused its discretion by making a finding that contradicted the jury's verdict on the attempted murder count and that was the explicit foundation of the court's decision to stay the life term. We accordingly vacate the sentence and remand for a full resentencing.

## BACKGROUND

### I.      The crimes

The following facts are taken verbatim from our opinion in Jenkins's first appeal, *People v. Jenkins* (Mar. 9, 2016, F069275) [nonpub opn.], 2016 WL 892654 (*Jenkins*).

"On June 3, 2013, at approximately 9:00 p.m., Kings County Sheriff's Deputy Cole Souza was on assigned patrol in the area of Kansas Avenue and State Route 43, a rural area. Souza was in uniform and driving a marked patrol car with overhead lights. Following his completion of a traffic stop involving another vehicle, Souza pulled up behind a 1975 Ford Maverick stopped at a red stoplight on Kansas Avenue. Souza noticed the vehicle's registration tags were expired and he ran the plate through the county dispatch center, which confirmed the registration for that vehicle was expired. When the light changed from red to green, Souza activated his overhead emergency lights to initiate a traffic stop. The vehicle yielded and pulled over on the shoulder. Souza exited his patrol car, approached the driver's side window, identified himself as a deputy sheriff, stated he stopped the driver for expired registration, and asked for the driver's license, proof of insurance and registration. Defendant stated he had just purchased the vehicle, he did not yet have insurance, and he did not have his driver's license on him but

2.

he had one, although he believed it was expired. Defendant provided a name of James G. Buchholtz and a birthdate of April 29, 1968. Souza returned to his patrol car and ran the information, which did not match a driver's license. Souza returned to the Maverick and informed defendant he did not believe he was being truthful. Defendant hung his head, admitted to giving Souza a false name, and said he might have a misdemeanor warrant out of Tulare County. Souza told defendant that misdemeanor warrants did not necessarily require being jailed and due to jail overcrowding, 'a lot of times' he was able to issue just a ticket and a new court date. Defendant then told Souza his name was James Dean Jenkins and his birthdate was April 29, 1969, and he provided a driver's license number from memory. Remaining by the driver's side window, Souza relayed the information to the dispatcher and was informed there were two warrants out for defendant's arrest, one of which was a no bail warrant.

"Souza ordered defendant to step out of the car. Defendant did not comply and asked if he was being taken in. Souza informed him he was under arrest and going to jail. Souza again ordered him to get out of the car. Defendant began revving the motor at a very high RPM while looking Souza directly in the eyes. Defendant ignored Souza's repeated commands to shut off the car and get out, and repeatedly revved the motor. Souza then attempted to pull defendant from the vehicle through the driver's side window by grabbing his left arm with both hands. However, defendant moved toward the center of the car and began to reach under the seat with his right hand. In Souza's experience, it is very common for people to keep firearms under the seat and, fearing defendant might be reaching for a gun, he took one or two steps back from the vehicle and withdrew his firearm from its holster. Souza yelled at defendant that he was under arrest, and to shut off the car and get out. With the motor still revved up to a high RPM, defendant took off, the wheels of his car burning out and kicking up a lot of dust and debris. Defendant made a U-turn in the road and headed in the opposite direction. Souza holstered his weapon, radioed dispatch, and began pursuing the car with his lights flashing. At that

3.

point, approximately five minutes had elapsed since Souza first pulled defendant's car over.

"Kansas Avenue was a rural, undivided two-lane road with a speed limit of 55 miles per hour. It was dark at 9:00 p.m. and there were few street lights in the area. After defendant took off with Souza in pursuit, they reached speeds between 90 and 100 miles per hour. Two or three times, defendant turned off his vehicle's lights, leaving the car completely dark and undetectable to passing motorists, and crossed over into the oncoming traffic lane. On two or three occasions, oncoming vehicles were forced to make sudden turns and leave the roadway to avoid being hit head-on by defendant. One incident involved a Jeep Grand Cherokee and another incident involved a big rig truck, which fishtailed and went off the road when the driver had to lock up his brakes suddenly to avoid defendant, who was traveling with his headlights off at the time. Defendant subsequently turned on Road 28. The speed limit remained at 55 miles per hour, and the pursuit continued at between 90 and 100 miles per hour. Approximately one-half mile along Road 28, defendant slammed on his brakes for no apparent reason, causing Souza to have to lock up his brakes to avoid colliding with the rear of defendant's car. The chase then continued down a dry, dusty farming access road. Defendant's vehicle was kicking up so much dust that Souza could not see the front of his car. At that point, Souza turned off his flashing lights and siren and proceeded at a slow pace. Souza caught up to the Maverick again when it turned on Road 36, and he picked up the pursuit and notified dispatch.

"Defendant and Souza continued to travel at speeds averaging between 80 and 90 miles per hour. Defendant repeatedly turned his lights on and off and drove in and out of his traffic lane. After defendant turned on Avenue 248, he drove onto a residential property with a dirt driveway. Defendant continued toward a shop area on the property and began spinning 'brodies' in the dirt, kicking up so much dust that Souza could not see anything. Periodically, Souza could see defendant's headlights and taillights through

4.

the dust, followed by loss of visibility due to thick dust in the air. Souza cracked his window and could hear defendant revving the motor. During one of the revolutions, defendant's car came within a few feet of hitting Souza's patrol car. Defendant eventually made his way back onto the roadway, with Souza following behind once he realized defendant had left the residential property.

"Kings County Sheriff's Deputy W. Brabant, Jr., was also on duty that night, patrolling an area approximately eight miles from Souza's pursuit of defendant. At 9:35 p.m., he headed toward Souza's location to assist with the pursuit. Brabant was also in a marked patrol car, and the flashing lights and siren were activated. He was traveling at approximately 80 miles per hour when he caught sight of a silhouette in the dark. Once his headlights caught the silhouette, he saw it was a vehicle traveling toward him. When the unlit vehicle was approximately 100 to 150 yards away from him, the driver switched on the headlights and swerved into Brabant's traffic lane, coming toward him head-on. Brabant reflexively jerked the steering wheel to the right and his patrol car went onto the shoulder of the road. Brabant lost some control of the car due to the loose dirt on the shoulder and he saw he was heading directly for a power pole. Brabant 'whipped the wheel' back to the left to regain control. Defendant's vehicle remained on the wrong side of the road in Brabant's lane. Brabant did not observe brake lights and he heard the vehicle continue to accelerate away, building speed.

"After Brabant was back on the roadway, he was the first vehicle in pursuit of defendant, with Souza following behind.[4] Brabant could see a 1970's model Ford Maverick, subsequently identified as defendant's, ahead of him traveling at approximately 100 miles per hour. Souza and Brabant continued pursuing defendant at speeds between 60 and 70 miles per hour. Defendant continued to turn his lights on and

---

[4] Brabant was a K-9 handler, and K-9 units generally take the first position in a vehicle pursuit, in the event the dog is needed to apprehend a fleeing driver.

5.

off and cross over into the oncoming traffic lane. After turning on yet another road, defendant ran a stop sign in excess of 100 miles per hour. Defendant then turned on another dirt road and kicked up so much thick dust that Souza and Brabant were forced to discontinue the pursuit. It was approximately 10:00 p.m. when they discontinued their pursuit of defendant. Souza, Brabant, and other law enforcement officers subsequently canvassed the area for defendant, without success.

"When Souza returned to the substation that night, he pulled up the DMV photo on the computer using the information defendant had provided during the traffic stop. The photo for James Dean Jenkins matched the driver he had been pursuing in the Maverick. Several hours later, Souza was notified by a Tulare County Police Department sergeant that defendant's vehicle had been located behind a Walmart in Tulare." (*Jenkins, supra,* 2016 WL 892654, at pp. *1–3.)

## II. Procedural history

### A. Original sentencing and appeal

Jenkins was convicted by a jury of attempted premeditated murder of a peace officer (§§ 664, subds. (e), (f), 187, subd. (a); count 1); two counts of assault with a deadly weapon on a peace officer (§ 245, subd. (c); counts 2 [Deputy Brabant] & 3 [Deputy Souza]); operating a motor vehicle with willful or wanton disregard for the safety of persons while fleeing from a pursuing police officer (Veh. Code, § 2800.2, subd. (a); count 4); willfully operating a motor vehicle in a direction opposite to lawful traffic during flight from a pursuing peace officer (Veh. Code, § 2800.4; count 5); and four misdemeanors. In a bifurcated proceeding, the trial court found true three prior prison term enhancement allegations (§ 667.5, subd. (b)).

Jenkins was sentenced to an indeterminate term of 15 years to life on count 1, the attempted murder. The court imposed consecutive terms of five years (the upper term) on count 3 and eight months on each of counts 4 and 5 (one-third of two-year midterm).

6.

The terms imposed on counts 2 and 11[5] were stayed under section 654. The court also imposed an additional year for each prior prison term enhancement, resulting in a total determinate term of nine years, four months.

We affirmed Jenkins's judgment on March 9, 2016. (*Jenkins, supra,* 2016 WL 892654 at p. * 7.)

**B.      Section 1172.75**

In 2021, the California Legislature passed Senate Bill No. 483, which added section 1172.75 (Stats. 2021, ch. 728, § 3.) Section 1172.75 declared legally invalid one-year sentencing enhancements for a prior prison term, unless the prior prison term was for a sexually violent offense. (*Id.*, at subd. (a).) If a judgment includes a qualifying enhancement, the trial court must recall the sentence and resentence the defendant. (§ 1172.75, subd. (c).) Further, the resentencing court shall "apply any other changes in law that reduce sentences or provide for judicial discretion so as to eliminate disparity of sentences and to promote uniformity of sentencing." (§ 1172.75, subd. (d)(2).)

Resentencing under section 1172.75 "shall result in a lesser sentence than the one originally imposed … unless the court finds by clear and convincing evidence that imposing a lesser sentence would endanger public safety. Resentencing pursuant to this section shall not result in a longer sentence than the one originally imposed." (§ 1172.75, subd. (d)(1).) Moreover, the court may take into consideration postconviction factors, and "[u]nless the court originally imposed the upper term, the court may not impose a sentence exceeding the middle term unless there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and those facts have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (*Id.*, subds. (d)(3), (d)(4).)

---

[5] Count 11 was one of the four misdemeanors of which Jenkins was convicted.

## C.     Proceedings under section 1172.75

In 2022, the trial court determined that Jenkins might be entitled to resentencing under section 1172.75 and set a hearing for appointment of counsel.  Jenkins submitted briefing in which he asked the trial court to strike his three prior prison term enhancements and resentence him to the middle term on count 3 (whereas he originally received the upper term), stay the terms imposed on counts 4 and 5 under section 654, and stay the indeterminate term on count 1 (attempted murder) and execute the term on count 2 (assault with a deadly weapon) under section 654.

Jenkins's request to stay the term imposed for attempted murder and execute the term imposed for assault with a deadly weapon was based on the changes to section 654 as a result of the enactment of Assembly Bill No. 518 (2021–2022 Reg. Sess.) (AB 518).  Before AB 518's passage, section 654, subdivision (a), provided that, when a defendant committed an act or omission punishable by two or more provisions of the law, the trial court must impose sentence under the provision that provides for the longest potential term of imprisonment.  (Former § 654, subd. (a); Stats. 1997, ch. 410, § 1.)  AB 518, effective January 1, 2022, amended section 654, subdivision (a), to permit an act or omission punishable under two or more provisions of law to "be punished under either of such provisions."  (§ 654, subd. (a), as amended by Stats. 2021, ch. 441, § 1.)  Thus, under newly amended section 654, a trial court is no longer required to punish the defendant under the longest possible term of imprisonment when multiple offenses are based on the same act or omission.  (*People v. White* (2022) 86 Cal.App.5th 1229, 1236.)  Rather, the trial court now has " 'discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence.' " (*Ibid.*; see *People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

Under amended section 654, Jenkins asked the court to stay the indeterminate life term for the attempted murder of Deputy Brabant (count 1) and execute the term for the

assault with a deadly weapon on Deputy Brabant (count 2). He argued that his intent while driving on the wrong side of the road toward the oncoming deputy was not to murder the deputy but to evade arrest. He cited the fact that he turned on his headlights while driving at the oncoming deputy as proof that he tried warning the deputy; he asserted that he would not have turned on his headlights had he wanted to kill the deputy. He stated that "the facts do not support an intent to kill, but rather an intent to evade the officers."

As to this section 654 issue, the People argued that the evidence showed Jenkins decided he would do whatever necessary to avoid capture that day, including killing an officer or himself. They also cited the probation report noting Jenkins's remorselessness, his failure to gain anything from prior grants of probation, and the significant risk he poses to the community from his continuing dangerous behavior. The People also pointed to Jenkins's misbehavior in prison as shown by his six rules violation reports, two of which were for fighting and labeled "serious." The People concluded that staying the indeterminate term would endanger public safety.

The trial court issued a tentative ruling ahead of the resentencing hearing. The trial court first determined that Jenkins is entitled to section 1172.75 relief because his three prior prison terms were not for sexually violent offenses. (§ 1172.75, subd. (a).) The court accordingly struck those three enhancements.

The court also in its tentative ruling determined that it should not resentence Jenkins to the middle term instead of the upper term on count 3 and that Jenkins was not entitled to relief under AB 518 (§ 654) as to counts 4 and 5. But the court found Jenkins was entitled to relief under AB 518 as to counts 1 and 2. That is, the court determined that the mandatory indeterminate term on count 1 should be stayed and the term imposed on count 2 should be executed. In support, the court stated that it could be "inferred" from the evidence at trial that Jenkins turned on his lights while driving toward Deputy Brabant's car to alert the deputy of his presence and avoid a collision. From this

9.

inference, the court concluded that assault with a deadly weapon was the "most appropriate" offense for Jenkins's conduct, not attempted murder. The court explained:

> "The People neglected to mention that when [Jenkins] was approximately 100 to 150 yards away from Deputy Brabant's vehicle, [Jenkins] switched on his headlights, prior to swerving into Brabant's traffic lane, coming toward him head-on. As [defense counsel] pointed out, 'If Mr. Jenkins intended on attempting to murder the deputy by a stealth act, he would not have turned his lights on. Logically, it can be inferred that Mr. Jenkins turned his lights on to alert the deputy of his presence on the rural road.'

> "Attempted murder is a specific intent crime whereas assault with a deadly weapon is not. Given the fact that [Jenkins] turned on his headlights prior to swerving into Deputy Brabant's Lane when he was about 100–150 feet away, in my opinion, the offense which is most appropriate for [Jenkins's] conduct is assault with a deadly weapon by means of force likely to produce great bodily injury upon a peace officer, and not attempted murder."

The court explained that the language of section 1172.75, subdivision (d)(1), also supported staying the indeterminate term. Subdivision (d)(1) states that resentencing "shall result in a lesser sentence than the one originally imposed … unless the court finds by clear and convincing evidence that imposing a lesser sentence would endanger public safety." (§ 1172.75, subd. (d)(1).) Unable to find a definition of "would endanger public safety," the court looked to section 1170.18, subdivision (c), which reads: "As used throughout this code, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." The trial court held that nothing in Jenkins's record besides the attempted murder conviction suggested that he would "present an unreasonable risk of commit[ting] a violent felony," and thus the court concluded there was "not clear and convincing evidence that imposing a lesser sentence would endanger public safety."

The court also considered postconviction factors in determining whether to stay the indeterminate term. The court considered the probation department's most recent report which related Jenkins's statements that he had participated in many programs and had changed himself in prison and that he appeared remorseful. Jenkins had also excelled at his prison job but also had accumulated six rules violation reports. The court concluded that Jenkins's disciplinary record and rehabilitation record did not weigh for or against him. Still, the court found on balance that Jenkins's circumstances had changed since his original sentencing such that continued incarceration no longer served the interests of justice.

The People filed a supplemental brief addressing aspects of the tentative ruling. Resentencing took place November 14, 2024, where the trial court adopted the tentative ruling as final. It sentenced Jenkins to the upper term of five years on count 3 (assault on Deputy Souza), plus a consecutive 16-month term (one-third the midterm) on count 2 (assault on Deputy Brabant), plus consecutive eight-month terms (one-third the midterm) on each of counts 4 and 5. The trial court imposed a term of 15 years to life on count 1 and stayed it under section 654. The total sentence was seven years, eight months.

The trial court further ordered that Jenkins be placed on parole for two years upon his release from prison under section 3000.01, subdivision (b)(1), which states, "Any inmate sentenced to a determinate term shall be released on parole for a period of two years."

The People appealed from the new judgment entered at the November 14, 2024, resentencing hearing.

## DISCUSSION

### I.     The People's claims and appealability

The People's notice of appeal states that they appeal from "the November 14, 2024, order of the Superior Court imposing an unlawful sentence, reducing the punishment imposed, and affected a substantial right of the People[.]" They cite Penal

11.

Code section 1238, subdivision (a), subparagraphs (5), (6), and (10), as their statutory authority.

The People identify five issues in their opening brief. The first four issues concern the trial court's decision to stay the indeterminate term imposed on count 1 (attempted murder of Deputy Brabant) instead of the 16-month term imposed on count 2 (assault on Deputy Brabant). The fifth issue concerns parole supervision following resentencing. The first four claims are:

1. The trial court misapplied section 1172.75, subdivision (d)(1), by treating a public safety finding as required when the elimination of prison priors already yielded a lower sentence.

2. Even if a public safety finding was required, the trial court applied the wrong legal standard by importing the definition from section 1170.18 instead of section 1385.

3. Section 654 does not permit the court to stay Jenkins's indeterminate life sentence under section 664, subdivision (f), because doing so renders the statute's mandatory minimum confinement language meaningless.

4. Even if staying the life sentence was permissible, the trial court abused its discretion in resentencing Jenkins under section 654 by overlooking Jenkins's ongoing denial of guilt and contradicting the jury's finding of premeditated intent to murder.

The People's third claim is cognizable on appeal under section 1238, subdivision (a)(10), as it asserts the court imposed an unlawful sentence. An "unlawful sentence" in this context is one "not authorized by law."

The People's fourth claim is cognizable under section 1238, subdivision (a)(5), as it challenges an "order made after judgment, affecting the substantial rights of the [P]eople." Indeed, an order staying execution of sentence under section 654 is an order made after judgment within the meaning of section 1238, subdivision (a)(5). (*People v. Perez* (1979) 23 Cal.3d 545, 549.)

12.

We reject the People's third claim; section 654 permits a sentencing court to stay an indeterminate life term imposed under section 664, subdivision (f), in favor of a lower determinate term. However, we agree with the People's fourth claim; the trial court, in stating its reasons for staying the life term, made findings that contradicted the jury's verdict. This error was prejudicial, and we reverse and remand for a new sentencing hearing on that basis. We thus need not address the cognizability or merits of the People's first two claims of error concerning the trial court's sentencing choices.

We also need not address the People's fifth claim, which is not a claim of error as such, but more of a request for an advisory opinion. They assert that this court must resolve whether section 3000.01's mandatory parole term applies to a defendant resentenced under section 1172.75 who has already exhausted his custody credits. We need not address this question.

## II. Unauthorized sentence

We first address the People's claim that a portion of Jenkins's sentence was unauthorized. They assert that section 664, subdivision (f) (hereafter § 664(f)), prohibited the trial court from staying the indeterminate term for the attempted murder count. This presents a question of statutory interpretation, which is reviewed de novo. (*People v. Ramos* (2025) 112 Cal.App.5th 174, 182.)

Jenkins was convicted of willful, deliberate, and premeditated attempted murder of a peace officer. The punishment for that offense is governed by section 664, subdivisions (e) and (f). Subdivision (e) provides that when attempted murder is committed upon a peace officer, and the defendant knows or reasonably should know the victim is a peace officer engaged in the performance of his or her duties, the defendant shall be punished by imprisonment in the state prison for life with the possibility of parole. Subdivision (f) then builds upon subdivision (e) and provides for a term of 15 years to life if the attempted murder is willful, deliberate, and premeditated:

13.

"Notwithstanding subdivision (a), if the elements of subdivision (e) are proven in an attempted murder and it is also charged and admitted or found true by the trier of fact that the attempted murder was willful, deliberate, and premeditated, the person guilty of the attempt shall be punished by imprisonment in the state prison for 15 years to life. Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 shall not apply to reduce this minimum of 15 years in state prison, and the person shall not be released prior to serving 15 years' confinement."

The last sentence of subdivision (f) imposes additional restrictions designed to ensure the full minimum term of 15 years is actually served for persons convicted of attempted murder of a peace officer. The first clause of that sentence, Article 2.5 of Chapter 7 of Title 1 of Part 3, entitled "Credit on Term of Imprisonment," provides the mechanisms by which a prisoner can earn time credits to reduce their sentence. (§§ 2930–2936.) These credits—earned through good conduct, working jobs, and participating in prison programs—would ordinarily operate to reduce the minimum time a prisoner must serve before becoming eligible for parole. (§§ 2930–2936.) Section 664(f) expressly forecloses that possibility in its final sentence by providing that Article 2.5 "shall not apply to reduce this minimum term of 15 years in state prison[.]" The final sentence ends: "the person shall not be released prior to serving 15 years' confinement." As discussed below, the meaning and function of that final clause is the central question presented by the People's argument.

Faced with multiple convictions arising from the same act, the trial court exercised its discretion under the recently amended section 654 and stayed the section 664(f) life term in favor of a determinate term for assault with a deadly weapon. The practical consequence of that stay is significant: rather than serving an indeterminate life sentence with a 15-year floor and the possibility of never being released, Jenkins instead serves a fixed term with a guaranteed release date. The People contend this was error, arguing that section 664(f)'s mandatory sentencing language reflects a legislative design that is fundamentally incompatible with section 654's stay mechanism, and therefore the life

14.

sentence could not be stayed.  The People invoke the anti-surplusage canon to argue that the final clause of section 664(f)—"the person shall not be released prior to serving 15 years' confinement"—would be rendered meaningless unless it is read as prohibiting section 654 stays.  The anti-surplusage canon is a principle of statutory construction providing that courts should avoid interpretations that render any term or provision of a statute meaningless or redundant, on the presumption that the Legislature intended every word it chose to carry independent legal significance.  (*People v. Reynoza* (2024) 15 Cal.5th 982, 990; *Atlanta Falcons v. Workers' Compensation Appeals Board* (2025) 114 Cal.App.5th 1268, 1275.)

The People's anti-surplusage argument runs as follows.  Take section 664(f)'s final sentence:  "Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 shall not apply to reduce this minimum of 15 years in state prison, and the person shall not be released prior to serving 15 years' confinement."  The clause before the comma functions to exclude Article 2.5 credits, which are the mechanism by which a prisoner's minimum term is reduced.  If Article 2.5 credits are eliminated, the defendant is already guaranteed to serve the full 15 years, which makes the final clause a mere restatement of what the Article 2.5 exclusion already accomplished.  The only way to give the final clause independent meaning is to read it as doing something the Article 2.5 exclusion does not—namely, prohibiting a section 654 stay that would replace the life sentence with a shorter determinate term altogether.  The People rely on *People v. Caparaz* (2022) 80 Cal.App.5th 669 (*Caparaz*) as support for the proposition that the anti-surplusage canon can operate in precisely this way to find an implicit prohibition on section 654 stays in the mandatory sentencing statute.

In *Caparaz*, the defendant was convicted of multiple sexual offenses against children and sentenced under the One Strike law, which mandates severe indeterminate sentences for certain sexual crimes committed under specified circumstances.  (*Caparaz, supra,* 80 Cal.App.5th at pp. 687–688; see § 667.61, subds. (e)(4) & (j)(2) [the relevant

15.

subdivisions in *Caparaz*].)  The question before the First District was whether the trial court could, under the newly amended section 654, stay a One Strike sentence in favor of a shorter non-One Strike sentence for a conviction arising from the same act.  (*Id.* at pp. 688–689.)  The court held it could not, but its holding rested entirely on the specific text of section 667.61, subdivision (h), which reads:  "Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, a person who is subject to punishment under this section."  (*Id.* at p. 689.)  The court applied the anti-surplusage canon and reasoned that because a stay is a form of suspension, reading section 667.61, subdivision (h), as prohibiting only probation would render the phrase "nor shall the execution or imposition of sentence be suspended for" meaningless surplusage.  (*Ibid.*)  The court therefore concluded that section 667.61, subdivision (h), prohibited stays as well, and that the trial court was without discretion to stay the One Strike sentence notwithstanding the amended section 654.  (*Ibid.*)

The First District's holding in *Caparaz* was not the last word on the subject.  The Second District in *People v. Govan* (2023) 91 Cal.App.5th 1015 (*Govan*) examined the same language in section 667.61, subdivision (h), and reached the opposite conclusion, finding that the suspension provision was unique to a grant of probation and did not extend to section 654 stays.  (*Govan*, at p. 1020.)  In any event, even assuming *Caparaz* was correctly decided, it does not help the People here.  The anti-surplusage problem that drove the *Caparaz* court's analysis was rooted in specific statutory text—the explicit suspension language of section 667.61, subdivision (h)—that has no equivalent in section 664(f).  In *Caparaz*, the suspension language would have been rendered meaningless surplusage if read only to prohibit probation, because probation was already prohibited by other language in the same provision.  The anti-surplusage canon therefore had real and specific work to do:  it explained why the suspension language had to mean something beyond a probation prohibition, and the answer was that it prohibited stays as well.  Section 664(f) presents no such textual problem.  It contains no suspension

16.

language, no stay language, and nothing that directly implicates the section 654 mechanism at all. Without that textual hook, *Capataz* provides the People no analytical foothold.

The most natural reading of the final clause of section 664(f) is not that it silently prohibits section 654 stays, but rather that it states in plain terms the practical consequences of the Article 2.5 exclusion that immediately precedes it—that the defendant will not be released before serving 15 years. This expressive clarity, where the Legislature has stated both a legal restriction and the practical consequence in the same sentence, does not give rise to a surplusage problem here. As courts have recognized, redundancies are not uncommon in statutory drafting, and the better overall reading of a statute sometimes contains some redundancy. (*Pugin v. Garland* (2023) 599 U.S. 600, 609; *People v. Marquez* (2023) 89 Cal.App.5th 1212, 1223–1224.)

In that same vein, the anti-surplusage canon is simply a guide to statutory interpretation and is not invariably controlling. (*Skidgel v. California Unemployment Insurance Appeals Board* 12 Cal.5th 1, 21.) The People's proposed interpretation—that the final clause of section 664(f) silently embeds a prohibition on section 654 stays—is not the more natural reading of the statute. The Legislature has shown in other statutes that it knows exactly how to prohibit section 654 stays, having done so in section 667.61, subdivision (h), with explicit suspension language. To apply the anti-surplusage canon in the way the People propose would require this court to conclude that the Legislature accomplished the same result in section 664(f) through silence and implication. This conclusion would be unnatural when measured against the Legislature's own demonstrated drafting choices.

The People's argument therefore reduces to the proposition that the Legislature intended section 664(f) to function like section 667.61, subdivision (h), even though it did not write it that way. We reject the proposition for the foregoing reasons. The trial court

17.

retained discretion under amended section 654 to stay the section 664(f) sentence in favor of the determinate sentence for assault with a deadly weapon.

## II.     Abuse of discretion – improper finding

The People contend that even if the trial court had discretion to stay the indeterminate term in favor of the determinate term under section 654, the court abused that discretion in two respects. First, the People argue the court failed to consider Jenkins's ongoing denial of his intent to kill Deputy Brabant as a postconviction factor under section 1172.75, subdivision (d)(3). Second, the People argue the court abused its discretion by making an affirmative finding that Jenkins did not intend to kill the deputy, a finding that directly contradicts the jury's verdict of willful, deliberate, and premeditated attempted murder of a peace officer. We find it unnecessary to address the first contention because the second contention is meritorious and requires reversal on its own.

### A.     Basic law and standard of review

A trial court's resentencing decision under section 1172.75, subdivision (d), is reviewed for abuse of discretion. (*People v. Garcia* (2024) 101 Cal.App.5th 848, 856; see also *People v. Knowles* (2024) 105 Cal.App.5th 757, 764–765 (*Knowles*) [discretionary sentencing choices reviewed for abuse of discretion].) "A court abuses its sentencing discretion when it acts arbitrarily and capriciously, relies on improper matter in reaching its decision, or is unaware of the scope of its discretion so that it does not exercise informed discretion at all. [Citation.] Exercises of discretion must be 'consistent with the letter and spirit of the law.' " (*Knowles,* at p. 765.) A sentencing court may not support its discretionary sentencing choices with findings contradictory to a jury's findings. (*People v. Siko* (1988) 45 Cal.3d 820, 825–826 [jury's verdict included a specific finding which controlled question of whether section 654 applied to defendant's multiple violations of Penal Code]; cf. *People v. Curiel* (2023) 15 Cal.5th 433, 453–454 [relevant jury findings are preclusive in section 1172.6 proceedings unless

18.

significant change in the law since the findings were rendered warrants reexamination of issues]; accord, *People v. Arnold* (2023) 93 Cal.App.5th 376, 393 [remanded for new § 1172.6 evidentiary hearing in which "court shall not make any finding or rely on any evidence which contradicts the jury's findings that the personal use of a knife sentencing enhancement was not true"].)

"When a trial court abuses its discretion in choosing among available sentencing options," the reviewing court must decide if there is a reasonable probability the trial court would have made a different choice absent the abuse. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 426.) If there is such a reasonable probability, the reviewing court must vacate the sentence and remand for resentencing. (*Ibid.*)

## B.     Analysis

At resentencing, the trial court made a factual finding on the central element of murder—that is, intent—which contradicted the jury's verdict. We reproduce the relevant portion from the court's tentative ruling, which was adopted as final:

> "The People neglected to mention that when [Jenkins] was approximately 100 to 150 yards away from Deputy Brabant's vehicle, [Jenkins] switched on his headlights, prior to swerving into Brabant's traffic lane, coming toward him head-on. As [defense counsel] pointed out, 'If Mr. Jenkins intended on attempting to murder the deputy by a stealth act, he would not have turned his lights on. Logically, it can be inferred that Mr. Jenkins turned his lights on to alert the deputy of his presence on the rural road.'

> "Attempted murder is a specific intent crime whereas assault with a deadly weapon is not. Given the fact that [Jenkins] turned on his headlights prior to swerving into Deputy Brabant's Lane when he was about 100– 150 feet away, in my opinion, the offense which is most appropriate for [Jenkins's] conduct is assault with a deadly weapon by means of force likely to produce great bodily injury upon a peace officer, and not attempted murder."

On the strength of that reasoning, the court stayed the life sentence for attempted premeditated murder of a peace officer and executed the 16-month term for assault with a deadly weapon instead. This was error.

The trial court's ruling requires careful unpacking, because on its face it is framed as a sentencing choice; that is, the court said the offense "most appropriate" for Jenkins's conduct was assault, not attempted murder. But that framing obscures what the court was actually doing. That court was not simply choosing between two valid sentencing options in the exercise of its discretion. It was providing a reason for that choice, and the reason it gave was that Jenkins's conduct was inconsistent with the jury's finding that he intended to kill.

The court adopted defense counsel's argument that a person intending to commit murder by stealth would not have turned his headlights on, and from that premise inferred that Jenkins must have turned his lights on to alert the deputy rather than to kill him. This is a finding on the element of intent to kill as to the crime of attempted murder, and this element defines the legal difference between attempted murder and assault with a deadly weapon. (*In re B.M.* (2018) 6 Cal.5th 528, 533 [assault is a general intent crime and thus does not require specific intent to cause injury].) The court made that distinction explicit by observing that "attempted murder is a specific intent crime whereas assault with a deadly weapon is not" immediately before concluding that assault was the more appropriate offense. That sequence of reasoning shows the court believed that the evidence of intent to kill was unpersuasive and that assault with a deadly weapon better fit what Jenkins did. That shows the court, in every meaningful sense, made a finding that Jenkins did not intend to kill Deputy Brabant.

However, the jury had already decided the question the resentencing court purported to resolve. The jury convicted Jenkins of attempted premeditated murder, which requires a specific intent to kill, and we upheld that conviction on appeal. That

20.

finding was settled, and it was not available for reconsideration at the section 1172.75 resentencing hearing. The trial court thus erred by contradicting that finding.

The error was prejudicial. The improper finding was foundational to the court's reasoning, not merely incidental. The court explicitly found that the offense most appropriate for Jenkins's conduct was assault with a deadly weapon, not attempted murder, and it was that finding that drove the decision to stay the life sentence in favor of the 16-month determinate term. It is true that the court considered other factors at resentencing, including Jenkins's disciplinary record and record of rehabilitation while incarcerated, and found that those factors neither weighed for nor against Jenkins. The court also gave weight to the remorsefulness Jenkins had developed in prison. But these factors concerning his behavior and development in prison were secondary considerations. The court's finding on intent was an entirely different order of magnitude. That finding did not merely inform the court's sentencing discretion; it fundamentally transformed the court's understanding of the nature and gravity of the most serious offense Jenkins committed. Indeed, assaulting a police officer while trying to keep him from getting hurt is a substantially less serious offense than attempting to murder a police officer willfully, deliberately, and with premeditation.

## CONCLUSION

While the trial court had the statutory authority to stay execution of sentence on the attempted premeditated murder count, it could not support that decision with a finding that contradicted the jury's conviction, affirmed on appeal, on that crime. By the court's own stated reasoning, that is what it did, and that is not a permissible basis for resentencing under section 1172.75. This was an abuse of discretion and remand for full resentencing is required.

21.

**DISPOSITION**

The judgment is reversed and the matter is remanded for a new sentencing hearing under section 1172.75, consistent with this opinion.

SNAUFFER, J.

WE CONCUR:


LEVY, Acting P. J.


DE SANTOS, J.